IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PRINCETON DIGITAL IMAGE CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-1461-LPS-CJB |
| ) | |
| KONAMI DIGITAL ENTERTAINMENT ) | |
| INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM ORDER**

1.  Before the Court in this patent infringement action is Plaintiff Princeton Digital Image Corp.'s ("Plaintiff") motion to compel Defendant Konami Digital Entertainment Inc. ("Konami US") to produce core technical documents regarding certain accused products in this case that are in the possession of certain of Konami US's foreign affiliates. (D.I. 139) The Court has considered the parties' letter submissions, (D.I. 143, 149, 169, 170), as well as the parties' arguments made during the August 25, 2016 teleconference with the Court, (D.I. 174 (hereinafter, "Tr.")).

2.  More specifically, Plaintiff is requesting that Konami US be ordered to "supplement its core technical document production . . . to include the technical documents describing the features of each accused [video] game title, including the functional requirements, technical specifications, test plans and other relevant technical documents" by producing records in the possession of Konami US non-party "affiliates" Konami Holdings Corp. (the "Holding Company") and Konami Digital Entertainment, Ltd. ("Konami Japan"). (D.I. 143 at 3-4; *see also* D.I. 169 at 1-2; Tr. at 15) The Holding Company is a publicly traded company that ultimately owns both Konami US and Konami Japan. (D.I. 151, Declaration of Nobuko Horii

Minerd (hereinafter, "Minerd Decl."), at ¶ 5)[1] Konami Japan developed the *Dance Dance Revolution* videogames accused of infringing Plaintiff's United States Patent No. 5,513,129 in this case, (*id.*), and the videogames are in turn distributed by Konami US in the United States, (*id.* at ¶ 6).[2]

3. Federal Rule of Civil Procedure 34(a) requires the production of documents that are "in the responding party's possession, custody or control[.]" Fed. R. Civ. P. 34(a)(1). "In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce." *Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 140 (3d Cir. 1988). In the context of Rule 34(a), our Court has found that documents are in the "control" of a litigating party if that party has the "'legal right to obtain the documents required on demand'" from the non-party corporation. *Inline Connection Corp. v. AOL Time Warner Inc.*, No. C A 02-272-MPT, C A 02-477-MPT, 2006 WL 2864586, at *1 (D. Del. Oct. 5, 2006) (quoting *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 233 F.R.D. 143, 145 (D. Del. 2005)). The party seeking production of documents bears the burden of establishing the opposing party's control over those documents. *Id.*; *Playboy Entm't Grp., Inc. v. United States*, No. CIV.A. 96-94-JJF, 1997 WL 873550, at *3 (D. Del. Dec. 11, 1997).

4. In cases where a litigating company's sister corporation possesses the desired

---

[1] Konami US is a subsidiary of Konami Corporation of America, which, in turn, is a subsidiary of the Holding Company. (Minerd Decl. at ¶ 5)

[2] In addition to selling a subset of the videogames developed by Konami Japan, Konami US "also sells games made by nonparty game developers, such as Blitz Games which made some of the [accused] *Karaoke Revolution* [games]." (Tr. at 33; *see also* Minerd Decl. at ¶ 3)

2

documents, the United States Court of Appeals for the Third Circuit has set out two pathways for a finding of the requisite control under Rule 34(a). In *Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131 (3d Cir. 1988), the Third Circuit explained that in such situations, control has been found only where (1) "the sister corporation was found to be the alter ego of the litigating entity[;]" or (2) "the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf[.]" *Gerling*, 839 F.2d at 141.[3] As for circumstances that would satisfy the second scenario, the *Gerling* Court cited to a decision from this Court that served a representative "example" thereof, *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127 (D. Del. 1986), and went on to observe that "[w]here the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party." *Id.* at 140-41 (citing cases).

5. In asserting here that Konami US has control over core technical documents in the possession of Konami Japan,[4] and should thus be required to obtain and produce them, Plaintiff

---

[3] The *Gerling* Court noted that the "same" two paths exist in cases involving parent and subsidiary corporations where the litigating corporation is the subsidiary and the parent possesses the documents. *Gerling*, 839 F.2d at 140-41.

[4] The Court focuses its analysis in this Memorandum Order on the relationship between Konami Japan and Konami US, without further discussing the Holding Company. It does so in light of Konami US's representation that the Holding Company is a holding company only, and as such does not maintain any technical documents, (D.I. 170 at 1; Tr. at 27), and in light of the fact that Plaintiff has not demonstrated otherwise. Although the Court's analysis below will focus on Plaintiff's request with respect to Konami Japan, nevertheless, were the Holding Company to have any relevant core technical documents, the Court's decision would apply in the same way as to it.

3

relies on the second pathway set out in *Gerling*. (Tr. at 15-16) The Court, however, finds that Plaintiff has not met its burden of demonstrating such control, in that the Court cannot conclude, based on the current record, that "[Konami US] had acted with its sister [Konami Japan] in effecting the transaction giving rise to suit and is litigating on its behalf." *Gerling*, 839 F.2d at 141.

6. The Court notes up front that its decision here is not (and cannot) be based on *what might possibly be* or *what one might assume to be* the relationship between Konami US and Konami Japan with regard to the instant litigation. Instead, it has to be based on the *current record before the Court*, and what that record *actually demonstrates*. And it is on that front—as to the deficiencies in the current record with regard to the question of control—where Plaintiff's motion fails.

7. To that end, the Court notes Plaintiff has pointed to very little evidence with regard to the relationship between Konami US and Konami Japan.[5] Instead, the bulk of the

---

[5] Indeed, in describing the relationship between Konami US and Konami Japan, Plaintiff only attaches excerpts from an "Annual Financial Report" for the fiscal year ended March 31, 2016 for "Konami Holdings Corporation and its subsidiaries[.]" (D.I. 169, ex. B) This document, in turn, shows that the Holding Company has a 100% ownership interest in its subsidiaries Konami US and Konami Japan and that it "control[s]" these subsidiaries, in the sense that it has the ability to obtain returns from its involvement with the subsidiaries and has the ability to affect the amount of such returns. (*See id.* at 9, 55) However, the relevant inquiry here is whether *Konami US* has control over the documents of its affiliates. Plaintiff's counsel argues that this exhibit demonstrates that "the businesses [e.g., Konami US and Konami Japan] are intertwined" as "[t]hey have consolidated financials, after all[.]" (Tr. at 17) The Court cannot agree that the attached excerpts show even this much, however. According to Konami US's counsel, the context of the entire Report "makes clear that the reason [the Holding Company] provides consolidated financial statements is it is publicly traded, so investors have an interest in seeing what is going on with both the holding company and its wholly owned subsidiaries" but "[t]hat is not to say the company . . . treat[s] [the subsidiaries] as interchangeable." (*Id.* at 29) And nothing in the Annual Financial Report excerpts provided to the Court shows that Konami US's business is "intertwined" or "interchangeable" from that of

4

evidence that is in the record on this topic comes from Konami US, in the form of a Declaration of Konami US's Director of the Legal Department, Nobuko Horii Minerd ("Minerd Declaration"). (Minerd Decl. at ¶ 1) The Minerd Declaration does acknowledge that Konami Japan developed the accused *Dance Dance Revolution* videogames that are distributed by Konami US in the United States. (*Id.* at ¶¶ 5-6) Beyond that, however, the Minerd Declaration goes on to state the following with respect to the two entities:

- They have "different Presidents, separate Boards of Directors, and separate employees." (*Id.* at ¶ 6)[6]

- With respect to Konami Japan's documents, "Konami US does not have access to or the authority to direct Konami Japan to turn over its documents[,]" and "Konami US also does not have access to, or the authority to access, any computer servers owned and maintained by Konami Japan in Tokyo or in other locations." (*Id.* at ¶ 8)

- Konami US does not have the authority to "require employees of Konami Japan to attend depositions in the United States or to otherwise participate in United States discovery directed at other companies." (*Id.*)

8. The one additional relevant data point that Plaintiff cites, with regard to the

---

Konami Japan.

[6] During oral argument, Plaintiff's counsel questioned what exactly the Minerd Declaration means when it states that the two entities have "separate [b]oards"—suggesting that while this reference clearly indicates that the two entities have "constituted separate boards," that does not necessarily mean that there is no overlap of board members on the two boards. (Tr. at 24-25) And while it appears that there *might possibly* be some connection between or overlap among the two entities' boards, (*see id.* at 28 (Konami US's counsel noting his "belie[f] [that] the facts are that there may be some minimal overlap of board members as between Konami U.S. and Konami Japan . . . such that it may be the case that a current Konami U.S. board member has been at one time a board member of another Konami entity")), the Court has nothing concrete in the record on this score. Indeed, there is nothing in the evidentiary record before the Court at this time relating to the two entities' boards beyond the above-referenced statement in the Minerd Declaration.

5

control issue, is that Konami US has been able to "obtain [technical documents] in the past [from Konami Japan], for example, when it obtained copies of the source code for the accused games that it offered for inspection in lieu of producing documents." (D.I. 143 at 4 (citing *id.*, ex. 4 at 1-3); *see also* D.I. 169 at 2) On that front, the Minerd Declaration reports only that "Konami US has requested on occasion that Konami Japan provide high-level materials such as source code to Konami US in connection with discovery requests in civil litigation[.]" (Minerd Decl. at ¶ 9; *see also* D.I. 149 at 4 ("Konami [US] may have, on occasion, sought selected high-level documents from Konami Japan to evaluate litigation[.]")) From these less-than-clear statements, the Court can infer that Konami US has asked for and obtained source code from Konami Japan relevant to this litigation. What other "materials" Konami US has obtained from its foreign affiliate (if any) is something that Plaintiff has not established, and remains unclear to the Court.

9. In light of this slim record, the Court cannot conclude that Konami US "has acted with its sister [Konami Japan] in effecting the transaction giving rise to suit[.]" *Gerling*, 839 F.2d at 141. Plaintiff has not offered an articulation as to what it would mean for Konami US, in this patent litigation matter, to have "acted with" Konami Japan to "effect" the relevant "transaction[s]." Even assuming that here, this would require an analysis of Konami Japan's connection with Konami US's infringing conduct at issue, the Court does not have a lot to go on. It knows only that Konami Japan developed the accused products. Perhaps that alone would be enough to meet this test, but Plaintiff provides no citation to caselaw suggesting that is so. And the Court has not been provided with any other information about Konami Japan's connection to the instant litigation. Does Konami Japan benefit financially from Konami US's U.S.-based use

or sale of the accused games?[7] If so, to what degree? Do Konami Japan employees have some other role in the U.S.-based acts that give rise to the patent infringement claims here against Konami US? There is nothing in the record as to the answers to questions like these, and the answers to those questions might matter in this analysis. (*See* Tr. at 32-33 (citing *Glenz v. Sharp Elecs. Corp.*, Civil Action No. 08-3652(FSH)(MAS), 2010 WL 2758729, at *3 (D.N.J. July 12, 2010)); *id.* at 34).[8]

      10.     Similarly, the Court has no basis to conclude that Konami US "is litigating on

---

[7] Again, the Court might *assume* that the answer to this question is "yes" in light of the fact that Konami Japan developed the games, but it would prefer not to assume or guess when making such significant decisions—it needs a record to support a conclusion in Plaintiff's favor here.

[8] *See also AFL Telecomms. LLC v. SurplusEQ.com Inc.*, No. CV11-1086 PHX DGC, 2012 WL 2590557, at *2 (D. Ariz. July 5, 2012) (concluding that plaintiff ("AFL") was obligated to produce source code in the possession of its parent ("Fujikura") where the record showed that "'the subsidiary was an agent of the parent in the transaction giving rise to the suit and in litigating the suit on the parent's behalf[,]'" in that, *inter alia*, AFL was the exclusive licensee of Fujikura's intellectual property rights related to fusion splicers (the product at issue in the case), and "the licensee relationship between AFL and Fujikura was created specifically so that AFL could bring this lawsuit[,]" "AFL houses two Fujikura technicians in its office in South Carolina to perform repairs on fusion splicers[,]" and "AFL and Fujikura have maintained a close relationship throughout this lawsuit, with Fujikura personnel providing expertise and declarations when needed by AFL") (quoting *Gerling*, 839 F.2d at 140); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 443 (D.N.J. 1991) (also finding this test to be met, and therefore granting the plaintiff's motion to compel the defendant ("MAC") to produce documents in the possession of its parent company ("MC"), where the undisputed record showed that MC and MAC acted in the transaction that led to the breach of contract lawsuit "'as one'" given that, *inter alia*, MC made the "initial contact" with the plaintiff regarding the transaction and made additional "direct contact" with the plaintiff, allowing the court to view MC as "engineering the deal" that resulted in the instant lawsuit, and where the record further showed that "MC played a significant role in the transaction through its continued participation in the negotiation process[,]" the deal "was subject to MC's final approval[,]" and that there would be an "indeterminate division of profits between MAC and MC on this deal, to be determined at a later date, in which MAC's 'negotiator' would be a former MC employee, who was 'transferred' to MAC for these purposes and who is expected to be 'transferred' back to MC in the future").

[Konami Japan's] behalf." *Gerling*, 839 F.2d at 141. There is no record here of, for example, Konami Japan employees directing the course of this litigation or making important strategic decisions in the matter for Konami US. That Konami Japan has, in at least one instance, made evidence (source code) in its possession accessible to Konami US—simply in order to, according to the Minerd Declaration, "protect[] its employees from time-consuming work in connection with" this matter, (Minerd Decl. at ¶ 9)—cannot be enough to make this showing under Rule 34(a).

11. The caselaw (particularly that relied upon by the Third Circuit in *Gerling*) is in accord. As noted above, the *Gerling* Court cited to a case from this District, *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127 (D. Del. 1986), as the case best exemplifying a circumstance where a litigating entity "was an agent of the [other corporation] in the transaction giving rise to the suit and in litigating the suit on the [other corporation's] behalf." *Gerling*, 839 F.2d at 140-41.

12. In *Afros*, plaintiff Afros, S.p.A. ("Afros") alleged infringement of its patent, and defendant Krauss-Maffei Corp. ("KMC") counterclaimed for infringement of two of its own patents. *Afros*, 113 F.R.D. at 128-29. Afros later filed a motion to compel KMC to produce documents relating to the design and development of the products covered by KMC's patents, which were in the possession of non-party KMAG (KMC's parent corporation and the entity that originally developed and patented the products). *Id.* at 129. The *Afros* Court first noted that "[t]he control analysis for Rule 34 purposes . . . [requires] that there be close coordination between" the litigating party and the non-party possessing the documents. *Id.* Next, the *Afros* Court explained that the "'nature of the relationship' between the party over whom the court has

jurisdiction and the non-party with possession of the documents will determine whether a motion to compel discovery should be granted" and that there were three factors "of paramount importance" to this inquiry: "first, the corporate structure encompassing the different parties; second, the non-party's connection to the transaction at issue; third, to what degree will the non-party receive the benefit of any reward in the case." *Id.* at 130.

13.     In ultimately granting Afros' motion to compel, the Court highlighted the following facts with respect to the nature of KMC and KMAG's "very close" relationship: (1) KMC was KMAG's wholly owned subsidiary and was the exclusive seller of KMAG's products in the United States; (2) the four members comprising KMC's Board of Directors were all KMAG employees, and two of these board members also "played prominent roles in the management of KMC"; (3) every one of the four documents that KMC had produced in response to Afros' discovery request at issue "were obtained from KMAG's files," and the record demonstrated that KMAG provided these documents "in the interest of assisting KMC move this case toward trial" and "'with full cooperation'"; (4) "[k]ey decisions regarding [the] litigation, primarily the assignment of patent rights [from KMAG to KMC] and [the] decision to counterclaim, were made by a KMAG employee with no direct connection to KMC" and indeed, were made without even informing key KMC decision-makers beforehand; (5) "KMAG is responsible for the development" of the accused products, "and any question regarding infringement will necessarily reference acts it performed"; and (6) "KMAG would receive a direct benefit from a favorable judgment" because "KMAG's sales in the United States, through KMC, will be enhanced because it would be rid of a competitor or, if it chose, it could license Afros, thereby increasing the subsidiary's income through royalties." *Id.* at 131-32. All of these

facts, taken together, led the Court to conclude that "KMC has the requisite control" of the documents in KMAG's possession. *Id.* at 132.

14. Also instructive is the decision in *Alimenta (U.S.A.), Inc. v. Anheuser-Busch Cos, Inc.*, 99 F.R.D. 309 (N.D. Ga. 1983)—a case that the *Gerling* Court called out as one of the "few cases involving sister corporations under common control[.]" *Gerling*, 839 F.2d at 141. In *Alimenta*, a district court denied a motion to quash a subpoena to plaintiff that called for, *inter alia*, the production of documents in the possession of plaintiff's sister corporation. *Alimenta*, 99 F.R.D. at 310-14. In doing so, the *Alimenta* Court rejected plaintiff's argument that it could avoid production of the documents because it did not "control" them. Important to the *Alimenta* Court's decision was that the defendant had made a record demonstrating that: (1) there was a "close relationship between" the plaintiff and the non-party sister corporation; (2) the sister corporation was "intimately involved in the transaction at issue in this suit" in that the plaintiff had purchased certain peanuts at issue in the litigation from the sister corporation (and "sold" the peanuts to the defendant for the same price it had "paid" for them), the peanuts had been selected by the sister corporation's President before being shipped to the United States for re-sale to the defendant, and the plaintiff and the sister corporation were otherwise "in regular contact during the course of the transaction at issue" such that they had acted as "as one unit"; (3) the President of the sister corporation had been "'intimately involved in the discovery process'" in the instant litigation, including having participated in plaintiff's answers to interrogatories; and (4) the sister corporation's President had been deposed in the case and had been accompanied by plaintiff's counsel to that deposition. *Id.* at 310-13.

15. As compared, for example, to the robust fact patterns in *Afros* and *Alimenta*,

10

Plaintiff's showing here is clearly wanting. While the Court is aware that Konami Japan developed the accused *Dance Dance Revolution* videogames sold by Konami US, the Court otherwise has little information (as compared to the more detailed showings in *Afros* and *Alimenta*) of the role Konami Japan can be said to have played in the transactions giving rise to this suit. And though the Court is aware that Konami Japan and Konami US are subsidiaries of the Holding Company, and that Konami US has on at least one occasion obtained materials from Konami Japan relating to litigation (i.e., source code), the record here does not nearly compare to the records in *Afros* or *Alimenta* in terms of a showing that the sister corporation is intimately involved in the advancement of this litigation. To find sufficient control here, the Court would need to engage in a healthy amount of speculation as to Konami Japan's relationship with Konami US and as to its role in this case. Rule 34(a) does not sanction such a path. *Cf. Playboy Entm't Grp., Inc.*, 1997 WL 873550, at *3-4 (denying the defendants' motion to compel the plaintiff to produce documents in the possession of its parent company, where the defendants' "sparse submissions"—which demonstrated only that plaintiff is the wholly-owned subsidiary of the non-party company, that plaintiff's president is an executive vice president of the non-party company, and that the non-party company's Chief Executive Officer approves significant decisions regarding the operation of the plaintiff's business—coupled with defendants' "failure to demonstrate that [the plaintiff] can access these documents in the ordinary course of business upon demand," indicated an insufficiently close connection between the two companies to show the requisite "control" under Rule 34); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D. Del. 1979) (denying the plaintiff's motion to compel the defendant to produce documents belonging to its sister corporation where "[t]here is no evidence . . . that [the two companies]

have identical Boards of Directors, or that their respective business operations are so intertwined as to render meaningless their separate corporate entities") (*cited in Gerling*, 839 F.2d at 142).[9]

16. The Court notes that its decision in this regard does not necessarily foreclose Plaintiff from obtaining the documents at issue. For instance, Plaintiff may be able to make a better record in the future (via discovery from Konami US or otherwise) with respect to the relationship between Konami US and Konami Japan, in order to attempt to support a renewed request for Konami Japan's documents.[10]

---

[9] In addition to relying on the *Afros* case in support of its request—which the Court has already distinguished from the state of the record presently before it—Plaintiff also emphasizes the United States Court of Federal Claims' decision in *Cormack v. United States*, 117 Fed. Cl. 392 (Ct. Fed. Cl. 2014). (D.I. 143 at 4; D.I. 169 at 2) Although there are similarities between the situation in *Cormack* and this case, *Cormack* is also distinguishable in a few ways. For one thing, the record before the *Cormack* Court showed that the litigating party and its sister corporation "jointly worked [together] to develop the key technologies" at issue as demonstrated by, *inter alia*, a related technology transfer and license agreement entered into by the companies, and by e-mail communications of record. *Cormack*, 117 Fed. Cl. at 403-04. The Court concluded that this close "collaboration equips [the litigating party] both with access to [the non-party's] documents and with the requisite power to obtain them." *Id.* at 404. While it is undisputed here that Konami Japan developed the accused videogames, *the record before the Court* does not demonstrate the type of close collaboration between Konami US and Konami Japan that compelled the Court to find sufficient control in *Cormack*. Secondly, the Court notes that while *Cormack* cites to the Third Circuit's decision in *Gerling*, *Cormack* is not authority of the Third Circuit. It is unclear to the Court whether the Third Circuit would have found sufficient "control" were it presented with the facts at issue in *Cormack*.

[10] Of course, there are also other ways that Plaintiff could have tried to obtain these records at the case's outset from Konami Japan. For example, Plaintiff could have (but did not) seek discovery from Konami Japan pursuant to the processes of the Hague Convention. And Plaintiff could have named Konami Japan as a party in this case, had there been a basis to do so. (*See, e.g.*, Tr. at 30-31 (Konami US's counsel noting that Plaintiff has been aware of Konami Japan's role as the developer of the *Dance Dance Revolution* games since as early as 2013, and it therefore has "had ample opportunity to either name Konami Japan as a defendant, if [it] thought there was a basis for doing so, or to serve discovery using the procedures outlined in the Hague [Convention] to obtain documents from Konami Japan and [it] chose not to do so"); *see also* Tr. at 26)

17. For the reasons set out above, Plaintiff has not carried its burden here, and, therefore, Plaintiff's motion to compel is DENIED.[11]

Dated: August 31, 2016

*[signature]*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[11] The Court notes that it does not agree with Konami US's alternate position that the motion to compel should also be denied because Konami US has already made the source code and games themselves available to Plaintiff, and so "[a]ny technical information from Konami Japan would necessarily be inferior to the source code." (D.I. 149 at 4; *see also* D.I. 170 at 2 ("And Plaintiff has no overwhelming need for Japanese documents in any event—[Konami US] has made source code available for more than a year, and [Plaintiff] has declined to review it.")) This Court's "Default Standard for Discovery, Including Discovery of Electronically Stored Information ('ESI')" states that a plaintiff is entitled to core technical documents "*including but not limited to* operation manuals, product literature, schematics, and specifications." Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), at ¶ 4(b) (emphasis added). The Court is aware of no rule that states that if a defendant has produced source code, Plaintiff is not entitled to any other "core technical documents."

13